BASLE THEATRES, INC., a Pennsylvania corporation, Plaintiff,

v.

WARNER BROS. PICTURES DISTRIBUTING CORPORATION, a New York corporation; Loew's, Incorporated, a Delaware corporation; RKO Radio Pictures, Inc., a Delaware corporation; Twentieth Century-Fox Film Corporation, a New York corporation; Universal Film Exchanges, Inc., a Delaware corporation; United Artists Corporation a Delaware corporation, Defendants.

Civ. A. No. 12711.

United States District Court
W. D. Pennsylvania.

Oct. 27, 1958.

As Amended Jan. 19, 1959.

Decree Jan. 19, 1959.

Seymour Simon, Joseph Teitelbaum, Chicago, Ill., Robert Ceisler (of Ceisler & Rodgers), Washington, Pa., for plaintiff.

Charles Denby, Robert F. Banks, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendants.

McILVAINE, District Judge.

The above-entitled cause came on regularly for trial, and the Court having duly considered the evidence and being fully advised in the premises now finds the following:

### Findings of Fact

1. Plaintiff has been the owner and operator of the drive-in theater at Donaldson's Crossroads, Pennsylvania, since 1950. At the time it commenced to operate the theater, it was known as the Lakeview Drive-In Theatre, but in 1952, its name was changed to the Mt. Lebanon Drive-In Theatre.

2. The defendants: Warner Bros. Pictures Distributing Corporation (herein sometimes referred to for convenience as Warner); Loew's, Incorporated (herein sometimes referred to for convenience as Loew's); Universal Film Exchanges Inc. (herein sometimes referred to for convenience as Universal); Twentieth Century-Fox Film Corporation (herein sometimes referred to for convenience as Fox); United Artists Corporation (herein sometimes referred to for convenience as United Artists); and RKO Radio Pictures, Inc. (herein sometimes referred to for convenience as RKO) are corporations engaged in the distribution of motion pictures, and all of them except United Artists are either directly or through subsidiary or affiliated corporations engaged in the production of motion pictures. At the time this action was commenced, each of them maintained an office in Pittsburgh, Pennsylvania.

3. During the period from at least January 1, 1938, to at least January 1, 1950, in the case of RKO; from at least January 1, 1938, to at least March 1, 1953, in the case of Warner; and from at least January 1, 1938, to at least October 1, 1954, in the case of Loew's, the defendants named in this paragraph were directly or through subsidiary or affiliated corporations engaged in the operation of motion picture theaters throughout the United States.

4. From at least January 1, 1938 to March 1, 1953, a subsidiary of the parent corporation of Warner was engaged in the operation of theaters in Allegheny County and in the Western part of Pennsylvania, including the Stanley and Warner Theatres in downtown Pittsburgh and theaters in McKeesport, Tarentum, New Kensington, and Ambridge.

5. For at least 17 years prior to October, 1954, Loew's had a proprietary interest in the Penn Theatre in downtown Pittsburgh.

6. Defendants, and each of them, directly or indirectly engage in interstate commerce, and every branch of the motion picture industry involved in this action is either in or directly affects interstate commerce.

7. Defendant Fox is a successor and assign of Twentieth Century-Fox Film Corporation, a New York corporation (herein sometimes referred to for convenience as Fox-New York). The statements contained in Paragraphs two and six above are applicable to Fox-New York for the period from at least January 1, 1938, to September 27, 1952. During the period from at least January 1, 1938, to at least January 1, 1952, Fox-New York was directly or through subsidiary corporations engaged in the operations of motion picture theatres throughout the United States.

8. The principal downtown Pittsburgh theaters are the Penn, Stanley, Fulton, and J. P. Harris. These theaters ordinarily play pictures prior to their showing in any other theater in Allegheny County. The Warner Theatre has, from time to time, operated on a first run policy; that is, playing a number of pictures successively prior to their showing in any other theater in Allegheny County.

9. The Fulton Theatre is part of a theater circuit which operates not less

than thirty-five theaters. In 1946, and 1947, and for some time prior thereto, Edward C. Raftery was President of defendant United Artists and either Secretary or Treasurer of the corporation which was operating the Fulton Theatre. The J. P. Harris Theatre is operated by a theater circuit which also operates the South Hills Theatre in Dormont, Pennsylvania, and the Denis Theatre in Mt. Lebanon, Pennsylvania.

10. At some time prior to 1934, the defendants agreed with each other to establish and maintain a uniform system of releasing pictures for showing in Allegheny County and in towns near Allegheny County. In establishing this uniform system of release, the defendants agreed that they would license those of their pictures which received a first run showing at a downtown theater in Pittsburgh on the following availabilities, and would refrain from licensing such pictures on any earlier availability:

A. For second run showing in Allegheny County (except for theaters in McKeesport and Tarentum) twenty-eight days after the conclusion of downtown Pittsburgh first run showing.

B. For showing in theaters located in New Kensington, Tarentum, Ambridge, McKeesport, McDonald, and Aliquippa, fourteen days after the conclusion of downtown Pittsburgh first run showing.

11. The defendants have continued to adhere to the agreement between them described in Paragraph ten above down to the present time except that in the latter part of May, 1955, Fox commenced to license its pictures for second run showing in Pittsburgh and for showing in McKeesport, New Kensington, Aliquippa, Tarentum, Ambridge, and McDonald and for showing in the remainder of Allegheny County on an availability of twenty-one days after first run showing, downtown Pittsburgh.

12. Between January 1, 1938, and March 1, 1953, a subsidiary of the parent corporation of defendant Warner operated more theaters playing on an availability of fourteen days after first run Pittsburgh, and more theaters playing on an availability of twenty-eight days after first run Pittsburgh than were operated by any other single exhibitor.

13. Since March 1, 1953, Warner Theatres, Inc., which prior to that date was a subsidiary of the parent corporation of defendant Warner, has continued to operate more theaters playing on an availability of fourteen and twenty-eight days after first run Pittsburgh than are operated by any other single exhibitor.

14. The uniform system of releasing pictures, which the defendants agreed to establish and maintain, and which with the exception of defendant Fox, noted above in Paragraph eleven, they have maintained down to this date, has foreclosed competition in at least the following respects:

(a) Between defendants with respect to length of waiting time between Pittsburgh first run and succeeding runs in Allegheny County and in Ambridge, Aliquippa, and McDonald;

(b) Between Pittsburgh first run exhibitors and subsequent run exhibitors with respect to length of waiting time between their respective showings; and

(c) Between subsequent run theaters with respect to how soon after its Pittsburgh first run showing they may exhibit a picture. In addition by establishing and adhering to said uniform system of release, each defendant was assured that no other defendant would offer for license to subsequent run exhibitors in the Pittsburgh area for showing in a particular week any picture which had not been withdrawn from release for the period of time prescribed by said uniform system; the result was that competition between the defendants in licensing their pictures to subsequent run exhibitors in Allegheny County and in New Kensington, Ambridge, Aliquippa, and McDonald has been lessened as the number of pictures available for license in any particular week by subse-

quent run exhibitors has been controlled by said uniform system.

15. In fact, however, in 1954, there was a clearance in effect between the distributors and the downtown theaters over the Mt. Lebanon Drive-In, understood and contracted for, as follows: Universal, twenty-eight days; United Artists, forty-two days or more; Loew's, forty-two days or more; RKO, forty-two days or more; Warner, forty-two days or more; Fox, twenty-eight days in 1954, but reduced to twenty-one days in 1955.

16. The nearest theater to the Mt. Lebanon Drive-In Theatre is the Alhambra in Canonsburg, Pennsylvania. It is 4.3 or 5.4 miles from the Mt. Lebanon Drive-In, depending upon the route taken.

17. The Alhambra Theatre is licensed by the defendants to play seven days after first run Washington, Pennsylvania, and the defendants often license a first run theater in Washington, Pennsylvania, to play at the same time as the first run showing in the Pittsburgh downtown theaters.

18. In February, 1954, plaintiff requested each of the defendants to give it the opportunity to license pictures for showing immediately following their exhibition at the Alhambra. This request was uniformly refused by the defendants, and each defendant indicated it was willing to license pictures to the Mt. Lebanon Drive-In for showing only in a playing position under the uniform system of release described in Paragraph ten above. Thus, Universal informed plaintiff it would permit the Mt. Lebanon Drive-In to bid against the South Hills Theatre in Dormont, which is 10.8 miles away, for an exclusive showing on an availability of twenty-eight days after first run Pittsburgh. United Artists notified plaintiff it was willing to permit the Mt. Lebanon Drive-In to play at the same time as the Denis Theatre in Mt. Lebanon, Pennsylvania, which played fourteen days after showing at the South Hills or Hollywood Theatres in Dormont. Loew's notified plaintiff it was willing to permit plaintiff to bid against the Denis Theatre for an exclusive showing as between those two theaters on an availability of fourteen days after the South Hills. And RKO and Warner indicated they were willing to license pictures to the Mt. Lebanon Drive-In after their showing at the Denis. The earliest the Denis ordinarily played pictures was forty-five to forty-nine days after first run Pittsburgh. Fox advised plaintiff in the spring of 1954, that it could license Fox pictures on an availability of twenty-eight days after first run Pittsburgh. In May, 1955, Fox was willing to license its pictures to the Mt. Lebanon Drive-In to play twenty-one days after the Pittsburgh first run showing.

19. In 1948, or 1949, RKO decided to offer its pictures to the Mt. Lebanon Drive-In to play seven days after the Alhambra. In 1954, however, RKO was no longer willing to grant this availability to plaintiff.

20. Subsequent to the filing of this action, Loew's decided to offer its pictures to plaintiff for showing on an availability of seven days after Canonsburg, but never placed this decision in operation. N. C. Rosen, Pittsburgh Manager for Fox, was of the opinion in 1956, that the Mt. Lebanon Drive-In should be licensed seven or fourteen days after first run Washington, but this decision was never placed in operation.

21. In 1954, in determining the manner in which they would license pictures to the Mt. Lebanon Drive-In Theatre as described in Paragraph eighteen above, each defendant brought the Mt. Lebanon Drive-In within the coverage of the conspiracy described in Paragraph ten above, which they had agreed twenty or more years prior thereto to establish and maintain, and they required plaintiff to conform to the terms of said conspiracy in licensing pictures for its Mt. Lebanon Drive-In Theatre.

22. One motivation in making the availability offers by the respective defendants was to minimize any difficulties in continuing to adhere to the conspiracy they established many years before.

23. Many changes have taken place in the last twenty-five years in Pittsburgh and in Allegheny County, and these changes have had an effect on the motion picture business in that area. Among such changes are the following:

(a) Admission prices of downtown Pittsburgh first run theaters have increased;

(b) The length of time pictures have been shown at downtown Pittsburgh first run theaters has varied from not more than seven days to longer than four weeks;

(c) The amount of film rental which the downtown Pittsburgh first run theaters have paid to the defendants for the license of their pictures has varied substantially from less than $2,000 for some pictures to more than $45,000 for others;

(d) Twenty-eight indoor-type theaters located in the City of Pittsburgh, which theaters were in operation from January 1, 1940, to January 1, 1950, have closed since the latter date;

(e) Twenty indoor-type theaters, located in Allegheny County but outside the City of Pittsburgh, which were in operation from January 1, 1940, to January 1, 1950, have closed since the latter date;

(f) Fifteen drive-in theaters have been constructed and placed in operation in Allegheny County since January 1, 1948;

(g) Since 1950, there have been substantial shifts of population in Allegheny County. Many people who lived in Pittsburgh have moved to newly-developed suburban areas, and other persons have moved into Pittsburgh;

(h) There has been a substantial decline in motion picture theater attendance in Pittsburgh and in Allegheny County since about 1950;

(i) In or about 1953, the defendants introduced new techniques of projection which required a wider and different type of screen than formerly had been in use, and other changes in their projection equipment.

24. The uniform system of release described in Paragraph ten above was so rigid and inflexible that no changes were made in it to accommodate the release of pictures by defendants for showing in theaters in Allegheny County to the changes referred to in Paragraph twenty-three above, and the rigidity and inflexibility of such uniform system of release demonstrates that its maintenance over a period of at least twenty-four years, and probably longer, was unreasonable.

25. The South Hills Theatre which, as stated above, was located in Dormont and played on the twenty-eight day availability after Pittsburgh first run is located 10.8 miles northeast of the Mt. Lebanon Drive-In. The Hollywood Theatre, also located in Dormont, is 11.2 miles from the Mt. Lebanon Drive-In.

26. The defendants have licensed their pictures to drive-in theaters, which are closer to the first run theaters in downtown Pittsburgh than the Mt. Lebanon Drive-In Theatre is to such downtown theaters, on an availability of fourteen days after first run Pittsburgh. Among these drive-in theaters are the Greater Pittsburgh and the Harmar Drive-Ins. They have also licensed their pictures on a fourteen day availability to drive-in theaters which are closer to indoor theaters playing on a twenty-eight day availability than the Mt. Lebanon Drive-In is to the South Hills, Hollywood, or Denis. For example the Greater Pittsburgh Drive-In, which is licensed on a fourteen day availability, is less than six miles from the Rowland, which is licensed on a twenty-eight day availability; and the Harmar Drive-In is less than three miles from the Oaks Theater in Oakmont, which is also licensed on a twenty-eight day availability.

27. In refusing to license their pictures to the Mt. Lebanon Drive-In any earlier than twenty-eight days after first run Pittsburgh in the case of Universal, and forty-two or more days after such first run in the case of at least four of the other defendants, the defendants, and each of them, unreasonably discrim-

inated against plaintiff's theater by refusing it as early a playing position as they were offering to drive-in theaters licensed on a fourteen day availability.

28. When they indicated the basis on which they would do business with the Mt. Lebanon Drive-In, the defendants in effect gave priority and unreasonable clearance to theaters in downtown Pittsburgh over the Mt. Lebanon Drive-In Theatre.

29. Each defendant acted unreasonably in assigning the Mt. Lebanon Drive-In Theatre the playing position described in Paragraph eighteen above, subject to the limitations mentioned hereafter.

30. The aforesaid combination and conspiracy irreparably injured plaintiff's business in that by virtue of the operation of said conspiracy plaintiff was prevented from licensing motion pictures in an open and competitive market.

31. Prior to 1953, the aforesaid combination and conspiracy was of great benefit to theaters in Allegheny County and elsewhere operated by a corporation affiliated with the defendant Warner. However, even when Warner ceased to be affiliated with such corporation the defendants continued to adhere to their conspiracy.

32. Defendants, and each of them, have knowingly entered into an agreement and conspiracy to fix clearances and playing positions of theaters in Allegheny County and in New Kensington, Ambridge, Aliquippa, and McDonald in order to maintain a monopoly of first run exhibition in the City of Pittsburgh, to permit theaters formerly affiliated with defendant Warner to enjoy favored playing positions, and to eliminate competition between themselves in the licensing of pictures. This conspiracy and the actions of the defendants in maintaining and fostering the conspiracy have been unreasonable.

33. Said combination, conspiracy, and monopoly have deprived plaintiff of access to a free and open market in which it may purchase pictures for showing on an availability determined by its ability and willingness to pay fair and reasonable firm rental. And plaintiff has been relegated to an inferior position where it may obtain pictures from defendants only in a playing position permitted by their conspiracy.

## General Discussion

In reaching the results stated herein, the aura of the whole trial properly affects the trier of fact. It is a consideration of all the evidence that determines whether or not the burden of proof placed on the prevailing parties has been met.

The trial is affected by the type of testimony and the demeanor of the witness in giving that testimony. Sympathy has no place in affecting a verdict, but the witness' candor, interest, bias, and manner do have a marked effect on the evaluation of his testimony leading to the ultimate decision.

The one matter that has caused me the greatest concern is whether or not the plaintiff has suffered irreparable harm through the actions of the defendants. With perhaps too much candor, let me state that the plaintiff's President and General Manager on the witness stand gave this trier of fact no impression that he was a defenseless individual being devoured by a combination of corporate octopuses; here was no David facing Goliath; no heartstrings were wrenched; no tears were surreptitiously wiped from this juror's eyes. While as stated before sympathy for or against one of the parties has no place in a lawsuit yet any trier of fact would have the right to take into consideration that this college graduate who attended four years of law school with years of experience in the movie field did not know the area from which he drew his patrons, never asked for a fourteen day availability, and had difficulty deciding whether or not he had made "surveys" concerning his patronage. His candor and demeanor on the stand, and his relations toward the distributors would be most relevant in assessing the *amount* of damages. Frankly, on the evidence now before this Court,

his money damages would not be too sizable; but, nevertheless, it is apparent that if he had the opportunity of a fresher run of pictures at the theater he would have made more profit by attracting more people which would affect the box office totals as well as in all probability the concession profits. He has thus shown the necessary harm from the actions of all the defendants except Fox. As to Fox the damages sustained in the whole context of this case do not reach irreparable harm.

## Conspiracy

As to certain basic facts there is little disagreement, and the general picture could be stated quite simply. Many years ago a system of distribution was set up in the Pittsburgh area which in general provided for the protection of the first run downtown theater by establishing a fourteen and twenty-eight day availability to theaters in the Greater Pittsburgh area after the first run downtown showing. This we have called the "Pittsburgh Release System." This system in effect gave the downtown theaters a fourteen and twenty-eight day clearance over outlying theaters. All the defendant distributors knowingly participated in the system. Almost total conscious parallelism of action is apparent. Indeed, the similarity of dealing with the exhibitors by the distributors approached the dotting of the "i's" and the crossing of the "t's" in many of the various contracts between exhibitors and distributors, and even went so far as to allow all the different distributors to "interpret" any "ambiguity" in exactly the same manner. In addition the past business activities of many of the defendants substantiate this view. Is this enough to show a concert of action? It seems to the trier of fact that in the setting here and considering all the evidence there is no question that a conspiracy to set up the Pittsburgh Release System must be inferred. I am mindful that parallelism, conscious or unconscious, does not impute a conspiracy. But it is evidence along with all the other factors. Written agreements of conspiracies are not usually present. The circumstances here undoubtedly point to a conspiracy. Defendants admit that. They feel, however, it has not been proven. I feel it has. The burden of persuasion on that issue has been met.

What happened in later years? After the Paramount decree, the movie distributors became very conscious of the possibility of lawsuits that might face them on certain claimed monopolistic practices including runs and clearances. They examined each request from exhibitors with some care. But in the Pittsburgh area the majority of the defendants kept right on with the fourteen and twenty-eight day general system of clearances. They did not give any particular consideration to whether the fourteen and twenty-eight day system has resulted from a conspiracy between the distributors.

Portions of the Paramount decree were admitted into evidence. At the most they were only admissible under the limiting factors set down in Theatre Enterprises v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273, and only as relating to the business practices of the relevant defendants prior to 1945. My opinion in the case would be the same if they had been refused.

What is the Pittsburgh Release System but a "no-raiding" agreement between these business men to eliminate competition for customers. Then it follows as night follows day that it is clearly an agreement "in restraint of trade" which I feel to be unreasonable, and in addition could only have one purpose: the attempt to gain or hold a monopoly by those adhering to such a system.

It may be that such a private monopoly power and/or such an unreasonable restraint of trade is desirable in this complicated industry. Perhaps better relations between distributors and exhibitors does result because of such an agreement. But I think that it is accepted as part of our American tradition that a private monopoly power, however beneficial, cannot and will not be accepted except under

specific exclusionary legislation and usually then only when public regulation of the monopoly is provided as a safeguard against such a distortion of the accepted American system. If we destroy our free economy, we will destroy free government.

That the fruits of this conspiracy were an unreasonable restraint of trade is made clear in the formal findings and requires no further discussion.

Evidence has been introduced and it strenuously has been argued by able counsel for defendants that even if it be assumed that the Pittsburgh clearances and availabilities, or what we have referred to as the Pittsburgh System of Release, were maintained through conspiracy prior to the Paramount decree, any such conspiracy was abandoned by all of the defendants. With the exception of Fox, I disagree. The position of J. M. Eisenberg, attorney in Loew's sales department, is typical of the mental processes of the companies on this issue. While claiming to use independent judgment, they nevertheless came to the conclusion that the same pattern of release as had existed under the conspiracy was "necessary for our protection as distributors of pictures which play in first run Pittsburgh, that our revenue depended largely on it." They continued to fix their availabilities on the conspiratorial pattern. There was no withdrawal.

As to Fox the situation is quite different. While it might appear on the surface that they took an inordinately long time to come to a conclusion after receiving plaintiff's request in 1954, to complete their withdrawal from the conspiracy it must be remembered that they were dealing with an uncooperative and uncommunicative customer, who on the witness stand here says he did not know from what area he drew his patrons.

### Clearances and Availabilities

All through the trial of this case, the attorneys and the Court continually used these words interchangeably, and indeed men who have spent their entire business practice in the movie industry were guilty of the same lapse. The reason for this is that while they have different meanings and may affect the legal result yet they as a practical matter are closely allied. In this case I conclude that when making a contract the distributors and exhibitors sometimes used the "availability" to in fact make a "clearance" agreement.

The specific clearance I found to exist in regard to the plaintiff herein is set forth in the formal findings, and was found to be unreasonable except as to Fox. Universal on this issue stands in a somewhat different position. It was an unreasonable clearance under the conspiracy, but as between a particular first run theater downtown Pittsburgh and the Mt. Lebanon Drive-In I would not necessarily hold it unreasonable. In such a case it is not whether I would think that a clearance of fourteen, eighteen, twenty-one, twenty-four, or thirty days is more reasonable than twenty-eight. The question is only as to whether, under all the evidence, a twenty-eight day clearance is unreasonable.

As to others I find the individual clearance of forty-two or more days is unreasonable. Without laboring the point, it suffices to say that by their demeanor on the stand I feel that most of the defendant-officers in reality also feel that such a clearance is unreasonable.

As to Fox, at the most, the specific clearance granted a downtown theater after 1954, under an implied clearance, is twenty-eight days reduced to twenty-one days in 1955, and this I hold not to be an unreasonable clearance.

It is apparent that in so ruling I have rejected the proposition that the only reasonable clearance concerning this drive-in is one based on Washington, Pennsylvania, as related to Canonsburg.

This theater is on the perimeter of what the defendants claim as the maximum circle encompassing what could be the substantial drawing area for the downtown first run pictures. The actual perimeter has not been established by the evidence in this case and this trier

of fact was somewhat surprised that almost all the defendants' witnesses drew this perimeter with almost no deviation one from another.

The evidence points to the unmistakable conclusion that, in originally setting up the Pittsburgh System of Release, the distributors felt that the theaters closer to downtown should have the longer availability. The towns placed on the fourteen day availability were on the outskirts. The violation of this rule points up the unreasonableness of the defendants to this plaintiff. The only Washington County town named within the perimeter is McDonald. However, in making availabilities the drive-ins near McKeesport and New Kensington have been given fourteen days; but in other parts of the perimeter the best offered availability is twenty-eight days. The explanations of why those theaters were given the fourteen day availability is unconvincing to this trier of fact.

### Conclusions of Law

1. The Court has jurisdiction of this cause and over the defendants, under the provisions of the anti-trust laws of the United States; and, more specifically, under the provisions of Sections 1, and 2, of the Act of Congress of July 2, 1890, 15 U.S.C. §§ 1, 2, 15 U.S.C.A. §§ 1, 2, commonly known as the Sherman Act, and under the provisions of Sections 12, and 16, of the Act of Congress of October 15, 1914, as amended and supplemented, commonly known as the Clayton Act, 15 U.S.C. §§ 22, and 26, 15 U.S.C.A. §§ 22, 26.

2. The licensing of pictures by the defendants to plaintiff and to other persons engaged in the operation of motion picture theaters and the exhibition of motion pictures in this judicial district, constitutes interstate trade and commerce within the meaning of the Sherman Act.

3. The defendants have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures, and attempted to monopolize such trade and commerce in viola-

tion of Sections 1 and 2 of the Sherman Act by conspiring with each other to maintain a uniform system of runs, clearances, and availabilities in Allegheny County and surrounding areas, and by extending the coverage of said system to plaintiff's Mt. Lebanon Drive-In Theatre, and by requiring plaintiff to conform to said system in licensing pictures for its Mt. Lebanon Drive-In Theatre. Thus, the conspiracy was a continuing one designed for the permanent regulation of the motion picture industry in Allegheny County, Pennsylvania, and in areas adjoining Allegheny County. Such conspiracy is illegal without regard to the reasonableness of the actions of defendants thereunder, because it resulted in a substantial elimination of competition in the distribution and exhibition of motion pictures.

4. However, the actions of the defendants in maintaining such conspiracy over almost a quarter of a century without change to adapt runs, clearances, and availabilities to changes in circumstances affecting the motion picture business in the area in which the conspiracy operated was unreasonable. The application of the conspiracy to plaintiff's theater, and the playing position which defendants assigned to plaintiff's theater under the conspiracy were also unreasonable acts on the part of defendants operating under the conspiracy. For those additional reasons, the combination and conspiracy in which the defendants engaged constituted an unreasonable restraint upon interstate trade and commerce and an attempt to monopolize the distribution and exhibition of motion pictures in violation of Sections 1 and 2 of the Sherman Act.

5. Plaintiff was entitled as of right to license and show motion pictures released by the defendants, free of the restraints of the uniform system of runs, clearances, and availabilities established by the defendants pursuant to the conspiracy.

6. The clearances established between all the defendants, except Fox and

Universal, and the downtown theaters over the Mt. Lebanon Drive-In, were unreasonable in and of themselves aside from the conspiracy.

■ 7. The combination and conspiracy of defendants to restrain and monopolize interstate trade and commerce in motion picture film is a continuing one and threatens irreparable loss to plaintiff in its operation of the Mt. Lebanon Drive-In Theatre, and unless enjoined, will continue, to the further damage of plaintiff.

8. The parties are directed to submit their proposals for a decree to be entered by the Court within ten days from the date of filing these findings.

## DECREE

I. The defendants are, and each of them is enjoined from continuing to adhere to maintain, enforce or attempt to enforce the conspiracy described in the Court's Findings of Fact Number 10 and Number 32.

II. For the purpose of uprooting the Pittsburgh Release System and the entire conspiracy the court has found to exist, and to remove all vestiges thereof, and to prevent delay in the exhibition of motion pictures at theaters playing subsequent to the first run Pittsburgh showing, each defendant is enjoined and restrained from granting its first run licensee in Pittsburgh a clearance of any picture in excess of seventeen days, which period of time shall commence to run on the conclusion of the first run showing except that if a picture is shown first run for more than twenty-five days, said period of time shall commence to run at the end of the twenty-fifth day. This provision shall not apply to specially handled pictures which the distributor thereof releases nationally in a manner other than the usual course of release, provided that this exemption shall not be applicable to more than three pictures per year released by any defendant. The uniform system of release described in Paragraph ten of the Findings of Fact filed in this cause is referred to in this Decree as the "Pittsburgh Release System."

III. In the event any defendant chooses to institute competitive bidding between exhibitors whose playing position is related to that of any theater in Allegheny County, (A) such defendant shall not discriminate against plaintiff in the conduct of such bidding or in making an award pursuant to such bidding, and (B) all bids and offers, counter-offers, and acceptances between such defendant and such theater regarding such bidding shall be in writing. Such defendant is prohibited from indicating orally or in writing to any theater what any other theater has bid. However, any theater engaging in such bidding shall have the right to inspect all such writing at defendant's place of business in Pittsburgh during its business hours upon notice to such defendant after the acceptance of the bid. Each defendant is restrained from acting upon any offer received from such theater which is not in writing.

IV. Each defendant is enjoined and restrained from (A) denying to plaintiff an opportunity to license any feature motion picture for exhibition at the Mt. Lebanon Drive-In Theatre on a run and subject to clearance and in a playing position at least as favorable as that afforded to any other drive-in theater whose playing position is related to that of any theater in Allegheny County, and (B) discriminating against plaintiff in any manner.

V. Each defendant is enjoined and restrained from entering into or performing any contract, agreement or license which has the effect of accomplishing or aiding in the performance of any of the acts enjoined by this decree.

VI. Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this decree to apply to the Court at any time for such order or direction as may be necessary or appropriate for the construction or carrying out of the same, or for the enforcement of compliance therewith, or for the punishment of violations thereof, or for ancillary, further, or supplemental relief or modification.

VII. Costs are assessed against the defendants, not including however Twentieth Century-Fox Film Corporation. The provisions of this decree are applicable to all of the defendants in this action except Twentieth Century-Fox Film Corporation.